## MARVIN ORECK, INC. v. CONNECTICUT GENERAL LIFE INSURANCE COMPANY AND ANOTHER.

186 N. W. (2d) 673.

March 26, 1971—No. 42340.

*Sachs, Latz & Kirschbaum* and *Louis Sachs*, for appellant.
*Hosmer A. Brown* and *Earl J. Myhre*, for respondent plaintiff.

Heard before Knutson, C. J., and Otis, Rogosheske, Kelly, and Frank T. Gallagher, JJ.

OTIS, JUSTICE.

This is an action to determine which of two claimants is the beneficiary entitled to the proceeds of a $50,000 life insurance

policy. The trial court found for the plaintiff corporation, and the defendant estate appeals. The policy in question was a business asset in a partnership which dissolved and was succeeded by various corporate entities, each of which retained ownership of the policies. The basic issue is whether in repurchasing the business, which had become insolvent, one of the partners was guilty of a breach of fiduciary duty by failing to make a full disclosure and by denying the other partner an adequate opportunity to participate in the reacquisition.

The chronology of events having a bearing on the outcome is complex. In 1949, Marvin Oreck owned 80 percent of a partnership in a clothing business with Dorothy Jenista, who held the remaining 20-percent interest. Upon Mr. Oreck's death in 1952, his widow continued the business on a limited partnership basis with Mrs. Jenista. The $50,000 policy here in question was written by Connecticut General Life Insurance Company on the life of Mrs. Oreck on May 24, 1954, and was payable to Mrs. Jenista, who was the absolute owner. A similar policy on the life of Mrs. Jenista and payable to the partnership was written the following fall. In 1955, the partnership was converted into a corporation and the policies were assigned to it with the right to change beneficiaries. Thereafter, the business was moved to Southdale, where it became a tenant of The Dayton Company. In the years 1956, 1957, and 1958, the business sustained losses which exceeded its assets. All of the stock in the corporation, which had already been pledged to The Dayton Company, was assigned to Dayton's in lieu of foreclosure in 1959. Two years later the corporation was dissolved, and the business was operated as a division of The Dayton Company under the name of Marvin Oreck. During the life of the corporation, Mrs. Jenista acted as its president. Mrs. Oreck was secretary and was employed only on a part-time basis. They continued on as employees of Dayton's at a reduced compensation. Meanwhile, title to the policies was vested in Dayton's, who also became the beneficiary.

On December 10, 1962, The Dayton Company offered Mrs.

Jenista, as president of Oreck's, an option to repurchase the business at any time between August 1, 1965, and October 31, 1965. It was proposed that a new corporation be formed to which the life insurance policies along with other assets would be transferred. The offer concluded with the following statement:

"We will immediately designate Dorothy B. Jenista or her estate the beneficiary of the life insurance policy on her life and designate Margot Oreck or her estate as the beneficiary of the life insurance policy on her life. Dayton's will continue to pay the premiums on these policies until July 31, 1965 * * *."

The following month The Dayton Company had Mrs. Oreck's estate designated as the beneficiary of the policy on her life and Mrs. Jenista's estate made the beneficiary of her policy. In so doing, The Dayton Company reserved the right to further change beneficiaries without the consent of the designated beneficiaries. On January 30, 1963, Mrs. Jenista and Mrs. Oreck signed an instrument in which each agreed to bequeath to the other the proceeds of the policy on her life. It is the option of December 10, 1962, and the agreement of January 30, 1963, on which Mrs. Oreck's estate predicates its claim in this litigation.

In 1965, pursuant to the option, a new Marvin Oreck company was incorporated by The Dayton Company, and in December of that year the new company purchased from Mrs. Oreck the right to use the name "Marvin Oreck," for which Mrs. Oreck was paid $3,500 a year for life. In addition, Mrs. Oreck loaned the company $10,000 which was repaid after her death. In February 1966, The Dayton Company made an absolute assignment of the policies to Marvin Oreck, Inc. Oreck in turn assigned the policies to First Southdale National Bank as collateral for a loan of $97,000 the proceeds of which were paid to The Dayton Company. The bank then became sole beneficiary of both policies. Concurrently, Mrs. Jenista bought Dayton's stock in the new corporation for the sum of $49,000. In addition, she and her husband personally guaranteed $60,000 for the bank's loan to the company.

On November 28, 1966, Mrs. Oreck died, and the $50,000 payable from her life insurance policy was deposited in escrow with the First National Bank of Minneapolis.

■ Mrs. Oreck's estate claims a vested interest in the policy on her life by virtue of the option agreement and her agreement with Mrs. Jenista dated January 30, 1963. The trial court held that Mrs. Oreck had no vested interest in the policy and that the assignment by Dayton's to Marvin Oreck, Inc., was not a breach of either agreement. The court pointed out that neither Mrs. Oreck nor Mrs. Jenista had control over the policies since The Dayton Company was the owner and expressly reserved the right to change beneficiaries. In this connection, it is significant, if not decisive, that from the time the policies were purchased in 1954 neither insured ever paid any of the premiums. They were always paid either by the partnership, one of the successor corporations, or by The Dayton Company. It is obvious that the policies were for the primary protection of the various business entities and were from the inception treated as business assets which survived the dissolution and reincorporation of the business. They were ultimately used as collateral for the loans negotiated to repurchase the business. The trial court was of the opinion that the agreement of January 30, 1963, at most, expressed an expectation. It could not, and did not, affect the right of the owner to change beneficiaries or use the policies for any purpose it saw fit. Since the agreement dealt only with the rights which the parties had after Dayton's designated each woman's estate as beneficiary of the policy on her life, we hold it did not vest in Mrs. Oreck a beneficial interest which could not thereafter be divested by Dayton's assignment of the policies to Marvin Oreck, Inc.

■ The principal ground for recovery advanced by Mrs. Oreck's estate is the claim that there was a breach of fiduciary duty owed by Mrs. Jenista to Mrs. Oreck arising out of their relationship as partners. In essence, defendant depicts Mrs. Oreck as an unstable, inexperienced alcoholic who had no under-

standing of her rights, who was not represented by counsel, on whom Mrs. Jenista imposed, and from whom she wilfully concealed the contents and import of the December 10, 1962, option agreement. The evidence with respect to Mrs. Oreck's physical and emotional condition was inconclusive. The trial court held that Mrs. Oreck was not an alcoholic and that she was not incapable of sound judgment or incompetent to deal with the parties here involved. Nor did alcohol affect "her ability to fully understand the extent, nature and effect of her acts and decisions and negotiations in any of the transactions pertinent to this case." In an accompanying memorandum, the trial court noted that from whatever illness Mrs. Oreck suffered it did not, according to her doctor, affect her alertness or intelligence. Furthermore, Mrs. Oreck's health seemed to improve after she was relieved of her business responsibilities. It was the duty of the trial court to resolve the conflicting inferences to be drawn from the medical testimony and the other evidence bearing on Mrs. Oreck's intellectual capacity. We hold that the court's findings on this issue are amply sustained by the evidence.

■ Defendant raises a number of additional issues concerning the circumstances surrounding Mrs. Oreck's failure to join Mrs. Jenista in exercising the option granted by The Dayton Company on December 10, 1962. In the course of the trial, the court asked Mrs. Jenista if Mrs. Oreck received a copy of the option agreement, to which Mrs. Jenista answered, "No." Her attorney, Mr. Brown, then stated, "That we will have to find out. Whether she received or saw the—." Mrs. Jenista responded, "She saw it. She did not receive a copy." Thereafter, Mrs. Jenista testified as follows:

"Q   [Mr. Brown]   And at this time did you physically show the original of this letter to Mrs. Oreck?
"A   Yes, I did.
"Q   And after you had the letter in your hands, do you recall what you did with it?
"A   I handed it to Mrs. Oreck.

*   *   *   *   *

"Q   Would you please tell me after you handed the letter to Mrs. Oreck, what you observed her do with the letter?

"A   She sat and read it.

\*   \*   \*   \*   \*

"The Court:   The answer at this time may stand, and I take it that, by your answer, Mrs. Jenista, to that question, you meant that Mrs. Oreck seemed to be reading the letter?

"The Witness:   As you and I seem to be reading.

"Q   [Mr. Brown]   She held the letter in front of her and looked at it?

"A   That's right.

"Q   And is that what you mean?

"A   That's right.

"Q   Did you notice if she turned the first page and looked at the second page?

"A   She read the letter twice.

"Q   Well, did she—

"A   I am sorry. She turned the page. This way (indicating).

\*   \*   \*   \*   \*

"Q   Do you recall how long this meeting lasted?

"A   It seemed to me that it lasted somewhere in the neighborhood of an hour and a half.

"Q   During that time you and Mrs. Oreck were both in your office?

"A   That's right."

Defendant complains that Mrs. Jenista's testimony was prompted by a leading question and asserts that, in any event, her testimony was a violation of Minn. St. 595.04 which excludes from evidence the testimony of "any party to an action, or any person interested in the event thereof" with respect to a conversation with a decedent.[1] We find no merit in this contention.

---

[1] Minn. St. 595.04 provides: "It shall not be competent for any party to an action, or any person interested in the event thereof, to give evidence therein of or concerning any conversation with, or admission of, a deceased or insane party or person relative to any matter at issue

This statutory exclusion is not a favorite of the law and is to be narrowly construed. Communication by acts, rather than by the spoken word, has been held to be admissible. Chadwick v. Cornish, 26 Minn. 28, 1 N. W. 55; Hall v. Northwestern Endowment & Legacy Assn. 47 Minn. 85, 49 N. W. 524; Spafford v. Hahn, 274 Minn. 180, 186, 143 N. W. (2d) 81, 85. It was therefore proper to receive in evidence testimony that Mrs. Oreck was handed the option agreement and was observed reading it.

■ A more difficult question is raised by the testimony of Warren Engberg concerning his conversations with Mrs. Oreck. Engberg was a director of the Marvin Oreck company who received an honorarium of $25 a year. Otherwise, he had no financial interest in the company either as an officer or stockholder. When asked whether Mrs. Oreck ever discussed with him the reacquisition of the business, he testified as follows:

"A   I would say in a limited way, yes.

"Q   What did she say to you?

"A   As I recall, she said, I have no reason to go back into the business, and I really don't want any part of it, from management or any standpoint.

\* \* \* \* \*

"A   Well, she didn't want any of the financial responsibility from the standpoint of investing in the firm, is what I would recall.

\* \* \* \* \*

"Q   Did she state at any time what she wanted to do as far as financial involvement in the business was concerned?

"A   She did not want any involvement. She did not want any part of ownership, as far as I recall her talking.

---

between the parties, unless the testimony of such deceased or insane person concerning such conversation or admission, given before his death or insanity, has been preserved and can be produced in evidence by the opposite party, and then only in respect to the conversation or admission to which such testimony relates."

"Q   What did she want to do in the business, Mr. Engberg, do you know?

"A   She did not want to do anything in the business except come in, as Mrs. Oreck used to come in, and talk to the people and visit with people.

"Q   Now, do you have an opinion of how many times this discussion was reiterated by her in your office?

"A   I would say at least on two occasions."

We do not delineate all of the circumstances under which a director will be disqualified from testifying because of the statute. However, it is difficult to perceive any interest Mr. Engberg had in the litigation which might color his testimony. To render him incompetent, it was incumbent on the defendant to prove that Engberg's interest was direct and immediate. In re Estate of Arnt, 237 Minn. 245, 248, 54 N. W. (2d) 333, 336. This, defendant has failed to do.

Defendant further complains that Engberg was not disclosed as a witness at pretrial as required by Rule 28L, Special Rules of Practice, Fourth Judicial District. Plaintiff counters with the statement that it could not anticipate the necessity for Mr. Engberg's testimony until defendant disclosed the nature of its defense as the trial progressed. While we are not entirely persuaded by plaintiff's position, we cannot say that the failure to disclose the identity of this witness was wilful or prejudicial so as to require a new trial. Freeburg v. Lillydale Grand Central Corp. 284 Minn. 388, 392, 170 N. W. (2d) 330, 333.

■ As a conclusion of law, the trial court held: "That this judgment shall draw interest on the sum of $49,440.50 from the 28th day of December, 1966, less credit for interest earned under the terms of the escrow agreement with First National Bank of Minneapolis." Where, as here, the disputed funds are in the hands of a stakeholder or a depositary, the authorities uniformly hold that the prevailing party is not entitled to interest beyond what is actually earned. One theory on which the rule is based is that defendant has not had the use of the funds to the exclusion

of the plaintiff. Some courts have denied recovery because the fund was put out of reach by court order,[2] while others have stressed the fact that the funds were impounded by stipulation.[3] This case falls into the latter category. Following a hearing on November 9, 1967, all of the parties entered a stipulation by the terms of which Connecticut General deposited with the First National Bank of Minneapolis as escrow the sum of $49,440.50 to be held in certificates of deposit until further order of the court or until released by the parties. By reason of the stipulation, and on the authorities cited, we hold that plaintiff is not entitled to interest over and above what was earned and paid by the First National Bank.

No costs are allowed to either party.

Affirmed in part and reversed in part.

---

[2] City of Barnsdall v. Curnutt, 201 Okla. 508, 510, 207 P. (2d) 320, 323; Franklin Bank v. Bruns, 84 Ohio 12, 95 N. E. 385; United Gas Pipe Line Co. v. Tyler Gas Serv. Co. (E. D. Tex.) 162 F. Supp. 496, 501; Peoples Gas Light & Coke Co. v. Hart, 310 Ill. App. 351, 34 N. E. (2d) 88; Warren v. Banning, 140 N. Y. 227, 35 N. E. 428; Wilson v. Wilson, 35 Wash. (2d) 364, 369, 212 P. (2d) 1022, 1025, which, as here, involved a dispute between two beneficiaries of a life insurance policy.

[3] Evancovich v. Schiller, 83 Utah 1, 26 P. (2d) 830.